## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN *RE* SUBPOENA TO<br>DAVID ISRAELITE<br><br>**David Israelite**<br>**975 F Street NW, Suite 375**<br>**Washington, D.C. 20004**<br><br>**Non-Party Movant.** | Misc. Case No. _____ |
| IN *RE* PETITION OF PANDORA MEDIA, INC. | No. 12 Civ. 8035 (DLC)(MHD)<br>Southern District of New York |
| *Related to:*<br><br>**UNITED STATES OF AMERICA,**<br><br>                  **Plaintiff**<br><br>          **v.**<br><br>**AMERICAN SOCIETY OF COMPOSERS,**<br>**AUTHORS AND PUBLISHERS,**<br><br>                  **Defendant.** | No. 41 Civ. 1395 (DLC)(MHD)<br>Southern District of New York |

### MOTION OF NON-PARTY DAVID ISRAELITE TO QUASH SUBPOENA

PLEASE TAKE NOTICE that upon the accompanying Affidavit of David Israelite ("Israelite"), the accompanying Memorandum of Law and all prior pleadings and proceedings had herein, the undersigned will move this Court, pursuant to Fed. R. Civ. P. 26(b) and Fed. R. Civ. P. 45(c), for an Order quashing the Subpoena *Ad Testificandum* served upon David Israelite by Pandora Media, Inc. ("Pandora") in its entirety (the "Subpoena") and for such other and further relief as the Court deems just and proper.

Dated: Washington, D.C.
      September 1⬤, 2013

By:_____

Andrew D. Lazerow
DC Bar No. 463461
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000
*Attorneys for Non-Party David Israelite*

TO:

Kenneth L. Steinthal
King & Spalding LLP
101 Second Street
Suite 2300
San Francisco, CA 94105
(415) 318-1211
*Attorneys for Pandora Media, Inc.*

Jay Cohen
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Ave of the Americas
New York, NY 10019
(212) 373-3163
*Attorneys for ASCAP*

Marc Brian Collier
Fulbright & Jaworski LLP
98 San Jacinto Blvd
Suite 1100
Austin, TX 78701
(512) 474-5201

Christine A. Pepe
ASCAP
One Lincoln Plaza
New York, NY 10023
(212) 621-6200

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN *RE* SUBPOENA TO** **DAVID ISRAELITE** **David Israelite** **975 F Street NW, Suite 375** **Washington, D.C. 20004** **Non-Party Movant.** | Misc. Case No. _____ |
| **IN *RE* PETITION OF PANDORA MEDIA, INC.** | No. 12 Civ. 8035 (DLC)(MHD) Southern District of New York |
| *Related to:* **UNITED STATES OF AMERICA,** **Plaintiff** **v.** **AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS,** **Defendant.** | No. 41 Civ. 1395 (DLC)(MHD) Southern District of New York |

**MEMORANDUM OF LAW IN SUPPORT OF DAVID ISRAELITE'S**
**MOTION TO QUASH SUBPOENA *AD TESTIFICANDUM***

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................................... 3

BACKGROUND ............................................................................................................................. 8

ARGUMENT ................................................................................................................................. 11

    *Topic 1* ............................................................................................................................... 15

    *Topic 2* ............................................................................................................................... 16

    *Topic 3* ............................................................................................................................... 18

    *Topic 4* ............................................................................................................................... 18

    *Topic 5* ............................................................................................................................... 19

    *Topic 6* ............................................................................................................................... 20

CONCLUSION ............................................................................................................................. 21

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(s)**

A&M Records v. Napster, Inc.,
 239 F.3d 1004 (9th Cir. 2001) ........................................................................11

Ackermann v. New York City Dep't of Info. Tech. & Telecomms.,
 No. 09 CV 2436 (JBW)(LB), 2010 U.S. Dist. LEXIS 28537
 (E.D.N.Y. Mar. 24, 2010) ........................................................................ *passim*

BMI v. CBS,
 441 U.S. 1 (1979)........................................................................................8, 9

Broadcast Music, Inc. v. DMX Inc.,
 683 F.3d 32 (2d Cir. 2012)................................................................................9

Burlodge Ltd. v. Standex International Corp. (In Re Motion to Compel Compliance),
 257 F.R.D. 12 (D.D.C. 2009)................................................................... *passim*

Corbett v. eHome Credit Corp.,
 No. 10-cv-26 (JG)(RLM), 2010 U.S. Dist. LEXIS 77712 (E.D.N.Y. Aug. 2, 2010) ........14

Cusumano v. Microsoft Corp.,
 162 F.3d 708 (1st Cir. 1998) ..........................................................................13

Eisemann v. Greene,
 No. 97 Civ. 6094 (JSR), 1998 U.S. Dist. LEXIS 4591 (S.D.N.Y. April 7, 1998),
 *aff'd in part*, 2000 U.S. App. LEXIS 2289 (2d Cir. Feb. 16, 2000), *rev'd in part*
 *on other grounds,* 204 F.3d 393 (2d Cir. 2000) ........................................ *passim*

N.C. Right to Life, Inc. v. Leake,
 231 F.R.D. 49 (D.D.C.2005)............................................................................13

Sterne Kessler Goldstein and Fox, PLLC v. Eastman Kodak Co.,
 276 F.R.D. 376 (D.D.C. 2011)...........................................................................13

Stevens v. Amtrak,
 No. 05-1924 (RCL), 2007 U.S. Dist. LEXIS 45761 (D.D.C. June 26, 2007) ........... *passim*

Watts v. SEC,
 482 F.3d 501 (D.C. Cir. 2007) .....................................................................11, 13

**STATUTES**                                                                  **PAGE(s)**

Fed. R. Civ. P. 26(b)(1) ...........................................................................................1

Fed. R. Civ. P. 26(b)(2)(C) .....................................................................................11

Fed. R. Civ. P. 45(c)(1) ...........................................................................................13

Fed. R. Civ. P. 45(c)(2)(B) .......................................................................................1

Fed. R. Civ. P. 45(c)(3)(A)(iv) ...........................................................................13, 15

Fed. R. Civ. P. 45(c) Advisory Committee's Note (1991) .................................... *passim*

17 U.S.C. 101 ...........................................................................................................9

**TREATISE**

9A Wright & Miller, <u>Federal Practice and Procedure: Civil 3d</u>§ 2463.1 .....................13

**BOOK**

Robert P. Merges et al., <u>Intellectual Property In The New Technological Age</u>, 424-425
    (4th ed. 2006) .................................................................................................9

**OTHER**

http://news.cnet.com/8301-1023_3-57556206-93/pandoras-web-radio-bill-is-doomed-well-for-
now/ ..........................................................................................................................4

Pursuant to Fed. R. Civ. P. 26(b) and Fed. R. Civ. P. 45(c), non-party David Israelite ("Israelite"), by his attorneys, Pryor Cashman LLP, respectfully submits this memorandum of law in support of his  Motion to Quash the Subpoena *Ad Testificandum* (the "Subpoena") issued by Pandora Media, Inc. ("Pandora").[1]  As shown below, the Subpoena, which commands the appearance of Israelite – the President and CEO of the National Music Publishers Association ("NMPA"), the trade organization that represents songwriters and music publishers – for a deposition on September 12, 2013, is unduly burdensome, harassing and vexatious.[2]

The Subpoena seeks testimony from Israelite on topics having nothing to do with the rate proceeding for which the testimony is purportedly required (the "Rate Proceeding").[3]  The Rate Proceeding is pending in the United States District Court for the Southern District of New York pursuant to the terms of a Consent Judgment ("AFJ2") between the United States of America (through the Department of Justice) and the American Association of Composers, Authors and Publishers ("ASCAP").  Judge Cote sits as the Rate Court Judge to determine the appropriate rate at which ASCAP can license public performance rights where the prospective licensee and ASCAP cannot agree upon the license terms.

Pandora has also issued subpoenas on various music publishers that have withdrawn certain rights from ASCAP (including music publishers with whom Pandora has entered into direct licenses), ostensibly because the "rates" set by those direct licenses have been offered by

---

[1] A copy of the Subpoena is annexed as <u>Exhibit A</u>  to the accompanying Declaration of David Israelite, sworn to on September 11, 2013. (the "Israelite Decl.").

[2] The original date for the deposition was August 15, 2013, which date was adjourned to September 12, 2013, in order to give the parties time to meet and confer to attempt to resolve the dispute as to whether Israelite should be required to testify in this case having nothing to do with Israelite. On September 11, 2013, the parties reached an impasse, necessitating this motion. In addition to seeking testimony, the Subpoena also commands Israelite to produce documents.  Israelite has objected to these demands under separate cover, pursuant to Fed. R. Civ. P. 45(c)(2)(B).  (A true and  correct copy of the Objections is annexed as <u>Exhibit B</u> to the Israelite Decl.)  This Motion pertains only to testimony sought by Pandora.

[3] A copy of Pandora's petition in the Rate Proceeding (the "Petition") is annexed as <u>Exhibit C</u> to the Israelite Decl.

ASCAP as an appropriate metric for Judge Cote to consider in setting rates in the Rate Proceeding. As set forth more fully below, David Israelite is the President and CEO of NMPA, which is a trade association whose primary purpose is to protect the rights of music publishers as a whole. Neither Israelite nor NMPA are music publishers. Neither David Israelite nor NMPA own, administer or license any rights in any musical compositions. Neither David Israelite nor NMPA negotiate licenses on behalf of any music publishers. Neither David Israelite nor NMPA are members of ASCAP In fact, David Israelite and NMPA have nothing whatsoever to do with any issue in the Rate Proceeding.

So why has Pandora issued a subpoena on David Israelite?  The answer is revealed in one of the key topics on which Pandora is requesting testimony from him: negative public comments about Pandora made by Mr. Israelite after the filing of the Rate Proceeding. This alone confirms that Pandora is abusing its subpoena power in an effort to silence David Israelite and stifle negative public commentary on Pandora's efforts to build a business on the back of the music business without paying fair value to the writers who create the songs.

As for the one topic that, stretching the limits of potential relevance, are even remotely and tangentially related to the issues involved in the Rate Proceeding, Pandora is fully aware that Mr. Israelite's knowledge is, at most, purely derivative of the music publishers that Pandora has already subpoenaed (and hence would be, at best, cumulative).  Pandora either has already obtained or will shortly obtain document and deposition discovery of those witnesses who do have personal knowledge on those issues through the subpoenas it has issued to the music publishers.[4]

---

[4] Indeed, based on the documents already produced by two of the publishers (Sony/ATV Music Publishing, LLC and EMI Music Publishing), Pandora knows exactly what communications David Israelite has had with the publishers and that there is nothing in his communications that has anything to do with the Rate Proceeding.

Because the Subpoena seeks: (1) opinion testimony from a witness who does not purport to be an expert; (2) hearsay evidence; (3) evidence that is cumulative of evidence given by several parties and non-parties with personal knowledge of the matters at issue; and, (4) evidence that only bears upon Mr. Israelite's expressed views about the impropriety of Pandora's attempt to deprive writers and publishers of any reasonable compensation for its use of their works, it is patent that the Subpoena is almost exclusively an exercise in the furtherance of a bad faith effort to punish an individual critical of Pandora.  The Subpoena is improper and should be quashed.

## **PRELIMINARY STATEMENT**

As indicated above, the Subpoena was issued in connection with the Rate Proceeding that Pandora commenced against ASCAP in the United States District Court for the Southern District of New York.  Pandora is an internet music service that transmits or "streams" to subscribers and other users of its service, millions of copyrighted musical works owned or administered by songwriters and/or music publishers.[5]  ASCAP is a voluntary membership "performing rights organization" consisting of thousands of composers, songwriters, lyricists and music publishers that individually and collectively control millions of copyright musical works.  As an aggregator of rights in these works, ASCAP licenses, collects and distributes royalties to its members generated in connection with public performances of those musical works, to the extent that ASCAP has been granted the rights by the copyright owners to license on their behalf.  Pandora's transmission of songs over the internet constitutes a public performance of the copyrighted works.

The Rate Proceeding involves a single, narrow issue.  Unhappy with the license fees that ASCAP had charged Pandora (and other services of its kind), Pandora had terminated its prior

---

[5]  Pandora allows users to identify their own music preferences, whether by artist or genre, after which Pandora creates a personalized station of songs for each user based on those preferences.

license with ASCAP and then requested a new license.  As provided in AFJ2, when a prospective licensee and ASCAP cannot agree on a rate, the parties have the right to seek the intervention of the Rate Court to fix a fair market rate.  In the Rate Proceeding, Pandora requested that Judge Cote reduce even further the prior existing (and miniscule) license fees that Pandora had to pay to stream millions of copyrighted songs over the internet.[6]

Under the ASCAP licensing scheme applicable to "New Media Services" (of which Pandora is but one), music publishers have the right to modify the grant of rights they have made to ASCAP to withdraw from ASCAP the right to license the publishers' public performance rights in certain "New Media Transmissions" (which include the type of transmissions that are being made by Pandora).[7]  When a music publisher removes from ASCAP the right to license any rights or users of rights in compositions owned by that music publisher, the music publisher is then the exclusive source of rights in the compositions they own.   In such instance, such as with Pandora (and other services defined as New Media Services), the prospective licensee must negotiate public performance license fees directly and solely with the music publishers.

In the Rate Proceeding, Pandora contends that the fees it should pay ASCAP for a license to perform the musical works of non-withdrawing publishers should be reduced to take into account Pandora's direct licenses with withdrawing publishers.  In addition, ASCAP contends that the rates obtained by music publishers issuing direct licenses are appropriate metrics for the

---

[6] For example, it has been reported that for the hit song "Beautiful," written by Linda Perry and recorded by Christina Aguilerra, Ms. Perry received  less than $350 for the over 12.7 million streams of that song on Pandora. See http://news.cnet.com/8301-1023_3-57556206-93/pandoras-web-radio-bill-is-doomed-well-for-now/

[7] In fact, because ASCAP is a voluntary association, upon the expiration of each member's membership agreement, they are free to withdraw all of their songs and all rights in all of their songs.  They could then, if they chose to do so, enter into a new mandate with ASCAP, limiting the rights they grant to ASCAP to certain media or uses.  Under the Copyright Act, public performance rights are purely consensual and a copyright owner can license the rights, withhold the rights or charge what it wants for the use of the rights.   Pursuant to AFJ2, only the aggregator, ASCAP, is restricted in terms of its licensing of public performance rights (making the licensing of the rights, at least in the hands of ASCAP, compulsory).

Rate Court to consider in setting the ASCAP rate.  To this extent, the rates at which withdrawing publishers have entered into their direct licenses are relevant in the Rate Proceeding.  David Israelite has nothing to do with the subject.

As noted, Mr. Israelite is the President and CEO of the NMPA,  a trade organization whose primary purpose is to protect the rights of music publishers as a whole by, among other things, lobbying Congress for stronger copyright protection, supporting copyright infringement suits against peer-to-peer music sharing sites and other serial infringers, and advocating for a more favorable economic terms for music publishers, including a more favorable split of royalties payable between publishers and record companies in connection with the exploitation of sound recordings embodying musical compositions.  NMPA is not a party to the Rate Proceeding and has nothing to do with AFJ2.

NMPA is not itself a music publisher.  It possesses no rights to exploit musical compositions or to license others to do so. It does not negotiate terms with parties interested in licensing musical compositions. And, it has no power to compel its member music publishers to do anything at all.  Nor is NMPA affiliated with ASCAP – it is not a member, nor does it have a place on the ASCAP board of directors.

Mr. Israelite and NMPA have never negotiated any licenses with Pandora or any competitors of Pandora that could be used as a "comparable" in setting a rate in the Rate Proceeding.  Nor has Mr. Israelite or NMPA been involved in the negotiation of licenses with Pandora or any competitors of Pandora by any of the music publishers or songwriters that NMPA represents.  Nor was Mr. Israelite or the NMPA involved in creating, negotiating, or formulating the so-called ASCAP "withdrawal right," either on NMPA's own behalf or on behalf of any of the music publishers that it represents, to the extent that withdrawal right itself is

relevant to the Rate Proceeding beyond the rates charged by the withdrawing publishers to license their public performance rights to Pandora or its competitors.  Again, as Pandora is fully aware.  David Israelite, as the President and CEO of NMPA, has been a vocal critic of Pandora and its approach to the payment of writers and publishers.  And in effort to squelch that criticism, and for no other reason, Pandora wants his deposition.

Despite the narrow scope of the Rate Proceeding and the fact that the NMPA is just a trade association that has no copyright rights, does not license music and does not control its constituent music publishers, Pandora has subpoenaed documents from NMPA and Mr. Israelite, as well as a deposition of Mr. Israelite on a variety of topics of which he has no first-hand personal knowledge[8], including:

- the licensing or potential licensing of Pandora by third-party music publishers who are members of NMPA – publishers who Pandora has also subpoenaed, who have produced documents or will be producing documents in the next few weeks, and have been deposed or who will be deposed within the next few weeks;[9]

- rates paid or payable to music publishers and sound recordings both with respect to Pandora and as a general matter – even though NMPA does not license or know the terms of any of its publisher members licenses and even though sound recordings are not at issue in the Rate Proceeding and even though Pandora can get all of this information both from ASCAP and from the publishers it has already subpoenaed;

- proceedings between ASCAP and Pandora under the ASCAP Consent Decree – which proceedings do not and have never involved NMPA or Mr. Israelite;

---

[8] After serving the subpoena, and in connection with the meet and confer process, Pandora agreed to modify the scope of the documents demanded by both the Subpoena served on Israelite as well as the subpoena served on NMPA.  While the topics on which Pandora seeks to depose Israelite in the Subpoena *Ad Testificandum* are related to the topics on which Pandora is seeking documents, it is unclear whether Pandora has agreed to modify the scope of the testimony it is seeking from Israelite to the same extent it has agreed to modify the scope of the documents it has demanded,.  Regardless, even  the scope of the testimony, as modified, is burdensome, harassing, and vexatious for the reasons set forth  herein.

[9] Mr. Israelite's and NMPA's counsel, Pryor Cashman LLP, is representing various third-party publishers in connection with subpoenas issued on them by Pandora in the Rate Proceeding and  is for this reason aware of the status of such discovery.

- a purchase by Pandora of a terrestrial radio station in which NMPA and Mr. Israelite had no involvement and as to which Israelite's knowledge would obviously be limited to what he read in the media (and which is not even at issue in the Rate Proceeding at this point as Pandora has not even received FCC approval for such purchase); and

- the withdrawal by music publishers from ASCAP of the right to license certain New Media Transmissions – even though any knowledge that Mr. Israelite has concerning the genesis of the withdrawal right, music publishers' decisions to withdraw rights from ASCAP or the publishers' negotiations with Pandora came after the fact, from the music publishers themselves, and even though Pandora has already obtained and continues to obtain documents and testimony directly from the music publishers, and it is the music publishers that have direct and personal knowledge of the genesis of the withdrawal right, the reasons why they exercised their withdrawal rights and what they negotiated with Pandora.

Pandora has sought to justify its improper subpoena on David Israelite by arguing that, if it turns out he does not have knowledge of these topics, then so be it.  But this proffered justification is purely pretextual and puts the proverbial cart before the horse.  Pandora needs to have a good faith basis for believing that the testimony that it seeks will lead to relevant and admissible evidence before subpoenaing testimony from Mr. Israelite.  Not only does Pandora not have such a good faith basis (indeed, its purported justification confirms it lacks such basis), it already knows from documents produced by Sony/ATV Music Publishing, LLC and from EMI Music Publishing reflecting communications with David Israelite that David Israelite has no personal, first-hand information on any topic on which Pandora purports to seek his deposition.

In short, Pandora is either on a fishing expedition, or it is seeking to harass Mr. Israelite because he has publicly criticized the service for paying pennies to publishers for the use of millions of their songs.  What it is not doing is legitimately seeking information by way of subpoena and the Subpoena should be quashed.

That Pandora's likely motive here is harassment and the stifling of public criticism is not hyperbole.  In addition to the topics mentioned above, Pandora seeks to compel Mr. Israelite to

testify about various public statements he has made in which he was critical of Pandora and the paltry amounts that Pandora has paid to songwriters, including statements made after the commencement of the Rate Proceeding.  Those statements were quite public and Pandora already has them.  They are, in any event, utterly irrelevant to this Rate Proceeding.  David Israelite's criticism of Pandora for paying writers and publishers pennies for steaming their songs millions of times to millions of Pandora subscribers (enabling Pandora to generate hundreds of millions of dollars in revenue) may be displeasing to Pandora, but it does not convert his criticism into a subject appropriate for inquiry in a Rate Proceeding.

David Israelite's opinions are not evidence, nor are they relevant to the Rate Proceeding. Pandora's inclusion of these topics is a transparent threat to Mr. Israelite:  continue to make statements that are critical of Pandora and we will punish you by forcing you to be deposed for hours on end on utterly irrelevant topics.  Such an abuse of the subpoena power should not be countenanced.

## BACKGROUND

Pandora operates a service that provides music and audio programming to users through the internet.  See Petition at ¶ 2.  When Pandora transmits or streams music to users, it constitutes a public performance of the transmitted work.  United States copyright law grants copyright owners the exclusive right to perform copyrighted works publicly for a profit – the public performance right.  See BMI v. CBS, 441 U.S. 1, 4-5 (1979).  Thus, to comply with copyright law, Pandora must secure public performance licenses either directly from copyright owners or from their representatives (performing rights organizations such as ASCAP or Broadcast Music, Inc.) which aggregate rights from thousands of writers and publishers, providing them with the ability to issue what are known as "blanket licenses."

ASCAP is a not-for-profit performing rights organization (a "PRO") that represents thousands of music publishers who hold copyrights in millions of musical works. See Broadcast Music, Inc. v. DMX Inc., 683 F.3d 32, 36 (2d Cir. 2012); BMI, 441 U.S. at 4-5. Members of ASCAP – *i.e.* participating music publishers – grant ASCAP a non-exclusive right to license certain types of public performances of their works to certain types of prospective licensees. Id. In turn, ASCAP issues licenses – to services like Pandora – and collects and distributes royalties to its members. Id.

Unhappy with the terms of its ASCAP license, Pandora terminated its license and sought a new license. When, as might be expected, Pandora and ASCAP failed to agree upon financial terms, Pandora commenced the underlying Rate Proceeding pursuant to Article IX of the Second Amended Final Judgment, United States v. Am. Society of Composers, Authors & Publishers, Civ. No. 41-1295 (S.D.N.Y. June 11, 2001). Under AFJ2, the Southern District of New York, sitting as a Rate Court, possesses continuing jurisdiction to set reasonable license fees for the public performance of works in the ASCAP catalogue.

As indicated above, in purported connection with the foregoing, Pandora served David Israelite with the Subpoena. The Subpoena commands testimony regarding six topics (the "Topics"), each as irrelevant, overly broad and unduly burdensome as the next: (1) the actual or potential licensing of Pandora by any music-publisher member or affiliate of NMPA; (2) the difference in public performance royalty rates payable to music publishers as compared to public performance royalty rates payable to sound recording companies;[10] (3) proceedings between

---

[10] In the context of music, copyright protection exists in two forms. First, a copyright exists in "sound recordings," original works that result from the fixation of sounds into a tangible medium. See 17 U.S.C. 101. Second, a copyright exists in the underlying "musical composition" or "musical work." See Robert P. Merges et al., Intellectual Property In The New Technological Age, 424-425 (4th ed. 2006). ASCAP *only* administers certain performance rights in certain musical compositions granted to it by the copyright owners (typically music publishers). Crucially, neither ASCAP nor the Petition relates whatsoever to performance royalties for sound recordings.

Pandora and ASCAP or Pandora and Broadcast Music, Inc. ("BMI"), a separate PRO, relating to the respective consent decrees governing each; (4) Pandora's purchase of KXMZ-FM;[11] (5) the withdrawal of the right to license performing rights for New Media Transmissions by any music publisher from any PRO;[12] and (6) the annual NMPA meeting held in June 2013 and/or any other meeting or conference concerning royalty rates or payments for public performances.

Manifestly, none of the testimony sought is relevant to the Rate Proceeding.  Moreover, the issues are those on which David Israelite has no direct personal knowledge and Pandora has already subpoenaed those who do have first hand personal knowledge of the issues on which it purports to require Mr. Israelite's testimony.  See Israelite Decl ¶ 5-31.  The Subpoena is invalid on its face and must be quashed as improper, unnecessary and unduly burdensome.

Again, NMPA has no involvement with the licensing of performance rights between ASCAP and Pandora, nor any involvement with licensing of performance rights more generally by music publishers directly.  NMPA owns no copyrights.  It licenses no copyrights.  See Israelite Decl. ¶ 6-7.  It is not a member of ASCAP.  See id.  NMPA is a trade association, comprised of a total of seven employees, including administrative staff.  See id.  NMPA represents music publishers and advocates on their behalf.  Specifically, NMPA seeks to protect and promote the property rights of its members by lobbying congress for stronger copyright protection for music publishers.  See id.  NMPA has also supported lawsuits by music publishers

---

[11] In June 2013, in a transparent gambit to pretend that it is really no different than a terrestrial radio service – for reasons beyond the scope of this Motion – Pandora purchased a small-market terrestrial radio station in Rapid City, South Dakota, a town of approximately 70,000 people.   Pandora has not been approved as a licensee by the FCC and therefore the issue of its putative ownership of the radio station is not yet even at issue in the Rate Proceeding.  Thus, this topic actually seeks testimony on an issue not in the Rate Proceeding.

[12] In April 2011, ASCAP adopted an amendment to its Governing Rules, permitting ASCAP members to withdraw from it the right to license public performances for certain New Media Transmissions.  See Petition at ¶ 17.  This amendment allows for ASCAP members to withdraw rights in songs from ASCAP's repertory and to negotiate direct licenses with licensees for such rights.  Several music publishers have withdrawn the right to license New Media Transmissions from ASCAP and have negotiated or consummated direct licenses with Pandora and with other new media entities.  Neither Israelite nor NMPA participated in any of the publishers' ASCAP withdrawals or in any direct license negotiations or ASCAP's setting of license fees.

against peer-to-peer file-sharing networks, including *Napster* and *Limewire*, for copyright infringement.  See, e.g., A&M Records v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001).

Thus, while Mr. Israelite and NMPA represent its members in connection with industry-wide policy issues that affect music publishers as a whole, neither he nor NMPA are involved with the licensing of Pandora or matters relating – even tangentially – to the Petition. Accordingly, the Subpoena is not directed appropriately to David Israelite because he possesses neither personal nor imputed knowledge of facts relevant to the Petition and Pandora has sought - and already obtained - discovery from the music publishers themselves, as well as from ASCAP.   The Subpoena imposes an undue burden on Mr. Israelite and is purely and transparently a vehicle to enable Pandora to harass and oppress him.  The Subpoena should  be quashed in its entirety.

## ARGUMENT

Pursuant to Fed. R. Civ. P. 26(b)(2)(C), a district court *must* limit discovery where the discovery sought is unreasonably cumulative or duplicative; can be obtained from other more convenient, less burdensome or less expensive sources; or the burden of the proposed discovery outweighs its benefits.  See, e.g., Watts v. SEC, 482 F.3d 501, 509 (D.C. Cir. 2007); Burlodge Ltd. v. Standex Int'l Corp. (In Re Motion to Compel Compliance), 257 F.R.D. 12, 18 (D.D.C. 2009); Stevens v. Amtrak, No. 05-1924(RCL), 2007 U.S. Dist. LEXIS 45761, at *9 (D.D.C. June 26, 2007).  The Subpoena at issue here falls into each of these enumerated criteria and, as such, should be quashed.

As shown below, any information that Mr. Israelite possesses with respect to the Rate Proceeding between ASCAP and Pandora is entirely derivative and hence cumulative of information that can be - and actually has been - obtained from other more convenient sources

that actually possess personal knowledge of the matters at issue in the Proceeding between Pandora and ASCAP.   Before addressing the specifics of why the Court should quash the Subpoena commanding Mr. Israelite to testify at a deposition, it is useful to reiterate the narrow scope of the Rate Proceeding in which Pandora seeks his deposition.

The only issue properly in the Rate Proceeding is the rate at which ASCAP licenses those compositions in which it has the right to license public performance rights to Pandora and other entities like Pandora.   To the extent that Pandora  invokes the music publishers' right to withdraw from ASCAP the authority to grant public performance licenses as having some bearing on the appropriate rate, then arguably, the withdrawal right has some tangential relevance.   But neither Mr. Israelite nor the NMPA can exercise - nor have they exercised - any withdrawal rights because they are not music publishers, and Mr. Israelite is not employed by a publisher.

Nor does David Israelite have the right to negotiate direct licenses with Pandora in the event a publisher exercises its withdrawal right nor has he ever done so.   Both the right to withdraw authority over the licensing of any performance rights from ASCAP and the concomitant exclusive right of the copyright owners to negotiate with Pandora a direct public performance license for the exploitation of the compositions with Pandora belong to the music publishers, not to Mr. Israelite or NMPA.   Accordingly, there are many other persons from whom Pandora can seek, and has in fact sought, relevant information, such as the music publishers themselves.   Those witnesses, unlike David Israelite, have personal knowledge of matters that Pandora seems to feel is somehow relevant to the Proceeding.   But Pandora does not need to obtain this information from David Israelite because any knowledge he has of the subject

is purely derivative.    Israelite Decl. ¶ __.    Pandora has already sought the same information

from the music publishers and has no reason, beyond harassment, to seek it from Mr. Israelite.

Moreover, pursuant to Fed. R. Civ. P. 45(c)(3)(A)(iv), a district court "*must quash … a*

*subpoena that … subjects a person to undue burden.*"  Fed. R. Civ. P. 45(c)(3)(A)(iv) (emphasis

added); see also Watts, 482 F.3d at 508; Burlodge, 257 F.R.D. at 18; Stevens, 2007 U.S. Dist.

LEXIS 45761, at *9.[13]  The undue burden standard applies to both document and testimonial

subpoenas.  See Watts, 482 F.3d at 508; see generally Sterne Kessler Goldstein and Fox, PLLC v.

Eastman Kodak Co., 276 F.R.D. 376 (D.D.C. 2011).

In assessing whether a subpoena imposes an undue burden, a district court, among other

factors, considers: the relevance of the disclosure sought; the need for the disclosure sought; and

the breadth of the disclosure sought.  See, e.g., N.C. Right to Life, Inc. v. Leake, 231 F.R.D. 49,

51 (D.D.C.2005); see also 9A Wright & Miller, Federal Practice and Procedure: Civil 3d §

2463.1 (explaining that "undue burden" is synonymous with "unreasonable and oppressive").  In

addition, a district court must give "special weight" to the concern for the unwanted burden a

subpoena may cause to non-parties.  See Watts, 482 F.3d at 509 (*quoting* Cusumano v. Microsoft

Corp., 162 F.3d 708, 717 (1st Cir. 1998)).  Particularly instructive is the Advisory Committee's

Note to Rule 45: "Illustratively, it might be unduly burdensome to compel [testimony] if the

[witness] is known to have no personal knowledge of matters in dispute …"  Fed. R. Civ. P. 45(c)

Advisory Committee's Note (1991).   As noted,  Pandora already knows from documents

produced by some of the music publishers that Mr. Israelite has no personal knowledge of the

matters in dispute.  Further, where, as here, a subpoena seeks irrelevant – or only tangentially

relevant – information from an individual with no personal knowledge of facts germane to the

---

[13] Relatedly, and separately, Rule 45 requires that an attorney serving a subpoena "take reasonable steps to avoid imposing undue burden or expense on the person subject to a subpoena."  Fed. R. Civ. P. 45(c)(1).

underlying dispute, it must be quashed.  See, e.g., Burlodge, 257 F.R.D. 18-20 (quashing subpoena which sought predominantly irrelevant information); Ackermann v. New York City Dep't of Info. Tech. & Telecomms., No. 09 CV 2436 (JBW)(LB), 2010 U.S. Dist. LEXIS 28537, at *4 (E.D.N.Y. Mar. 24, 2010) ("As [petitioner] states that he has no personal knowledge of plaintiff's claim, his motion to quash the subpoena requesting his deposition is granted"); Eisemann v. Greene, No. 97 Civ. 6094 (JSR), 1998 U.S. Dist. LEXIS 4591, at *4 (S.D.N.Y. April 7, 1998), aff'd in part, 2000 U.S. App. LEXIS 2289 (2d Cir. Feb. 16, 2000) (affirming decision to quash subpoena), rev'd in part on other grounds, 204 F.3d 393 (2d Cir. 2000) ("[I]n light of the doubtful and tangential relevance, at best, of anything that could reasonably be expected to emerge from the putative [non-party] deposition, the Court finds that enforcement of the subpoena would constitute an unreasonable or burdensome misuse of the discovery process") (citation and quotations omitted); Corbett v. eHome Credit Corp., No. 10-cv-26 (JG)(RLM), 2010 U.S. Dist. LEXIS 77712, at *10-11 (E.D.N.Y. Aug. 2, 2010) (same; in context of subpoena duces tecum).

Indeed, none of the testimony sought from Mr. Israelite, as articulated in the "Topics," is relevant – even tangentially – to a bona fide issue in dispute in the underlying proceeding.  Even assuming arguendo that some of the Topics are tangentially relevant to the Petition – which they are not – Mr. Israelite does not possess personal knowledge regarding those Topics, and therefore, the Subpoena is not directed properly to him.[14]  See Israelite Decl. ¶ 8.  Thus, any potential benefit derived from the disclosure sought is outweighed by the undue burden the Subpoena imposes; quite clearly, Pandora receives no benefit from the Subpoena apart from harassing and oppressing Mr. Israelite so as to dissuade others from criticizing Pandora publicly

---

[14] Israelite does not dispute that he possesses personal knowledge regarding Topic 6, Israelite Decl. ¶ _; rather, as explained infra, Topic 6 is utterly irrelevant to the Petition and underscores the inappropriate and abusive nature of the Subpoena as a whole.

in the future.   This is a blatant misuse of the subpoena power.   Further, the Subpoena is

unreasonably duplicative and cumulative because Pandora has served and obtained discovery

from music publishers and PROs separately.   Accordingly, the Court must quash the Subpoena

as unduly burdensome and violative of Fed. R. Civ. P. 45(c)(3)(A)(iv).   See, e.g., Burlodge, 257

F.R.D. at 17-19; Stevens, 2007 U.S. Dist. LEXIS 45761, at *9-10; Ackermann, 2010 U.S. Dist.

LEXIS 28537, at *4; Eisemann, 1998 U.S. Dist. LEXIS 4591, at *4; see also Fed. R. Civ. P. 45(c)

Advisory Committee's Note (1991).

While the impropriety of the Subpoena is manifest on its face, the unduly burdensome

and inappropriate nature of each proposed Topic merits brief discussion.   To be clear, Israelite

maintains that each and every Topic is palpably overbroad, unduly burdensome and improper

and that the Subpoena must be quashed in its entirety.[15]

### *Topic 1*

Topic 1 seeks testimony regarding, "the actual or potential licensing of Pandora by any

music-publisher member or affiliate of NMPA and/or by and PRO."

As explained, David Israelite, as CEO of NMPA, plays no role *whatsoever* in the

licensing of songs in *any* capacity.   He is not involved with the licensing of songs to Pandora by

any of its music-publisher members or by any PRO; he has no decision-making authority to

determine whether any publisher exercise its withdrawal rights; nor does he possess personal

knowledge of Pandora's actual or potential licensing.   .   Israelite Decl. ¶ __.   Therefore, Mr.

Israelite is not competent to testify on this this issue, and deposing him on this topic would not

yield any relevant, admissible evidence.

Further, to the extent Pandora seeks testimony regarding "potential licensing," such

information is not material to the Petition; to the extent Mr. Israelite had personal knowledge of

---

[15] Accordingly, the Subpoena cannot be cured by way of modification.   See, e.g., Burlodge Ltd., 257 F.R.D. at 12.

the "potential licensing" activities of NMPA member publishers (and he does not, Israelite Decl. ¶ __), he submits that Pandora seeks this testimony for the improper purpose of using such information to its advantage in negotiating future licenses with music publishers.

Finally, to the extent that Topic 1 is relevant to the Petition (i.e., to the extent it relates to the actual terms of actual licenses between music publishers and Pandora that could be relevant to establishing a market rate between willing licensors and willing licensees), Pandora should seek this testimony from those music publishers and from ASCAP, not from David Israelite. Accordingly, Topic 1 imposes an undue burden on Mr. Israelite because he does not possess personal knowledge of "actual or potential" licensing of Pandora, because it is irrelevant in whole or in part, and because it is unreasonably cumulative and duplicative and should be directed to music publishers and PROs.  See, e.g., Burlodge, 257 F.R.D. at 17-19; Stevens, 2007 U.S. Dist. LEXIS 45761, at *9-10; Ackermann, 2010 U.S. Dist. LEXIS 28537, at *4; Eisemann, 1998 U.S. Dist. LEXIS 459, at *4; see also Fed. R. Civ. P. 45(c) Advisory Committee's Note (1991).

### Topic 2

Topic 2 seeks testimony regarding, "the difference in public performance royalty rates payable to music publishers as compared to public performance royalty rates payable to sound recording companies."

First, Mr. Israelite is not privy to the terms of any licenses between music publishers and Pandora or competitors of Pandora for the public performance of musical compositions and, to the extent that he has been informed of any rates by any third parties, or has read about them in the media, his testimony would be inadmissible hearsay.  Israelite Decl. ¶ __.  To the extent that the Subpoena seeks to depose Mr. Israelite on rates for the public performance of compositions

generally (i.e., outside the context of Pandora or other internet radio services), then such testimony would be irrelevant to the Rate Proceeding even assuming he had knowledge regarding those rates.  Pandora already knows its own rates and it can obtain rates for other entities, to the extent relevant, from ASCAP or from the already subpoenaed music publishers.  It does not need David Israelite for any of this.

Second, as explained, ASCAP does not administer performance rights for sound recordings; rather, ASCAP only administers certain performance rights for musical compositions owned by certain music publishers.  Moreover, Pandora, to date, has not claimed that sound recording royalty rates or the ratio between rates for compositions and sound recordings should be used as a "benchmark" or "market comparable" for the purpose of setting rates for musical compositions administered by ASCAP.  While the ratio is indeed disproportionately skewed to the disfavor of compositions, Mr. Israelite's views on the subject are not evidence and are not relevant.  Topic 2 is beyond the scope of the Petition, wholly irrelevant and not reasonably calculated to lead to the discovery of information relating to a *bona fide* dispute.

Finally, to the extent that Topic 2 is somehow even tangentially relevant to the Petition – which it is not – Pandora should seek this testimony from the music publishers and the sound recording companies, not from Mr. Israelite.  Accordingly, Topic 2 imposes an undue burden on Israelite because he does not possess personal knowledge of the rates and terms of any license between a publisher and Pandora or a competitor of Pandora, because it is irrelevant to the Petition, because it is unreasonably cumulative and duplicative, and because the information sought thereby may be obtained less expensively from other more appropriate sources.  See, e.g., Burlodge, 257 F.R.D. at 17-19; Stevens, 2007 U.S. Dist. LEXIS 45761, at *9-10; Ackermann, 2010 U.S. Dist. LEXIS 28537, at *4; Eisemann, 1998 U.S. Dist. LEXIS 4591, at *4.

*Topic 3*

Topic 3 seeks testimony regarding, "proceedings between Pandora and each of ASCAP and BMI under the respective consent decrees governing those PROs."

Again, neither David Israelite nor NMPA are involved or have been involved in proceedings between Pandora and either ASCAP or BMI; Mr. Israelite does not possess personal knowledge of Topic 3.  Israelite Decl. ¶ __.  Further, to the extent Topic 3 seeks testimony regarding BMI, BMI is not relevant to the Petition, which concerns only Pandora and ASCAP. Finally, to the extent that Topic 3 is somehow even tangentially relevant to the Petition – which it is not – Pandora should seek this testimony from ASCAP and BMI, not Mr. Israelite. Accordingly, Topic 3 imposes an undue burden on Mr. Israelite because he does not possess personal knowledge of the same and Pandora should seek such testimony from ASCAP and BMI. See, e.g., Burlodge, 257 F.R.D. at 17-19; Stevens, 2007 U.S. Dist. LEXIS 45761, at *9-10; Ackermann, 2010 U.S. Dist. LEXIS 28537, at *4; Eisemann, 1998 U.S. Dist. LEXIS 4591, at *4; see also Fed. R. Civ. P. 45(c) Advisory Committee's Note (1991).

*Topic 4*

Topic 4 seeks testimony regarding, "Pandora's purchase of KXMZ-FM."

First, as noted above, this is not  at issue in the Rate Proceeding because to the best of Mr. Israelite's knowledge, the FCC has not even approved Pandora as a putative licensee.  Thus, quizzing him on a subject that is not at issue is manifestly unduly burdensome and harassing.

Second, Pandora's gambit to convert itself into a pretend terrestrial radio service rather than what it is, which is an internet streaming service, by acquiring a small radio station in South Dakota in 2013 is transparently too clever by half.  In any event, Mr. Israelite does not possess personal knowledge of *Pandora's* purchase of a radio station in South Dakota and to the extent

that Pandora wishes to stifle any criticism he may have of its gambit or any objection NMPA might make to the FCC, using a subpoena to accomplish such an end is  improper.

In short, Topic 4 is utterly irrelevant and beyond the scope of the Petition.  To the extent that David Israelite has criticized Pandora's purchase of KXMZ-FM, such statements are protected by the First Amendment, and have nothing to do with determining a reasonable royalty rate for public performance licenses.  Accordingly, Topic 4 imposes an undue burden on Mr. Israelite because he does not possess personal knowledge of the same and because it relates to palpably irrelevant facts and events.  See, e.g., Burlodge, 257 F.R.D. at 17-19; Stevens, 2007 U.S. Dist. LEXIS 45761, at *9-10; Ackermann, 2010 U.S. Dist. LEXIS 28537, at *4; Eisemann, 1998 U.S. Dist. LEXIS 4591, at *4; see also Fed. R. Civ. P. 45(c) Advisory Committee's Note (1991).

***Topic 5***

Topic 5 seeks testimony regarding, "the withdrawal of the right to license musical work performing rights for certain so-called 'New Media Transmissions' by any music publisher from any PRO."

As explained, David Israelite, as President and CEO of NMPA, did not participate in the actual or contemplated withdrawal by music publishers of rights from ASCAP or other PROs; accordingly, he has no direct first-hand personal knowledge of such information , Israelite Decl. ¶ __,   and Pandora has subpoenaed the music publishers and can obtain, and has obtained, the information directly from those with personal knowledge.  Further, to the extent Topic 5 seeks testimony regarding BMI and other PROs, these issues are beyond the scope of the Petition and irrelevant.  To the extent that Topic 5 is somehow even tangentially relevant to the Petition – which it is not – Pandora should seek this testimony from music publishers, ASCAP and other PROs, not Mr. Israelite (and, in fact, Pandora has done so).  Accordingly, Topic 5 imposes an

undue burden on Israelite because he does not possess personal knowledge of the same and Pandora should seek such testimony from music publishers and PRO.  See, e.g., Burlodge, 257 F.R.D. at 17-19; Stevens, 2007 U.S. Dist. LEXIS 45761, at *9-10; Ackermann, 2010 U.S. Dist. LEXIS 28537, at *4; Eisemann, 1998 U.S. Dist. LEXIS 4591, at *4; see also Fed. R. Civ. P. 45(c) Advisory Committee's Note (1991).

*Topic 6*

Topic 6 seeks testimony regarding, "presentations given by Israelite at the 2013 World Creators Summit, the 2011 Rethink Music Conference, the annual NMPA annual meeting in June 2013, and/or any other venues or meetings concerning (a) actual or proposed royalty rates for public performances … and/or (b) actual or proposed royalty payments for … public performances."

On its face, Topic 6 speaks volumes about the real purpose of Pandora's Subpoena.  It is wildly overbroad and improper; it does not seek testimony relating to a *bona fide* issue in dispute in the underlying Petition.  Instead, Pandora seeks testimony from David Israelite relating to *any* and *every* "meeting" or "venue" he has attended since January 1, 2010 in which performance rights have been discussed or "presented."  To the extent that Mr. Israelite has made statements or given presentations regarding public performance rights or discussed the same, this has no bearing on what constitutes a reasonable licensing rate for an ASCAP license and in no way relates to or affects the outcome of the Petition.[16]  Instead, as explained, Topic 6 makes plain that Pandora's true motive in serving the Subpoena is to punish Mr. Israelite for negative comments made regarding Pandora and to dissuade others from making similar comments in the future. This is a blatant misuse of the subpoena power and should not be sanctioned by this Court.

---

[16] To the extent that Pandora might try to justify such request based on alleged "collusion" among publishers, that too is not an issue in the Rate Proceeding (and Pandora lacks a good faith basis for any such claim in any event).

Accordingly, Topic 6 imposes an undue burden on Israelite because it is oppressive, harassing, vexatious and not reasonably calculated to lead to information relating to a *bona fide* issue in dispute in the underlying Petition.  See, e.g., Burlodge, 257 F.R.D. at 17-19; Stevens, 2007 U.S. Dist. LEXIS 45761, at *9-10; Ackermann, 2010 U.S. Dist. LEXIS 28537, at *4; Eisemann, 1998 U.S. Dist. LEXIS 4591, at *4.

## CONCLUSION

For all of the foregoing reasons, Israelite respectfully requests that his Motion To Quash Subpoena *Ad Testificandum* be granted in its entirety.

Dated:      Washington, D.C.
            September 11, 2013

                                        Andrew D. Lazerow
                                        DC Bar No. 463461
                                        Covington & Burling LLP
                                        1201 Pennsylvania Ave., N.W.
                                        Washington, D.C. 20004
                                        (202) 662-6000
                                        *Attorneys for Non-Party David Israelite*

TO:    Kenneth L. Steinthal
       King & Spalding LLP
       101 Second Street
       Suite 2300
       San Francisco, CA 94105
       (415) 318-1211
       *Attorneys for Pandora Media, Inc.*